Good morning and may it please the court, I'm James Laughlin and I represent the appellant Ricky Callahan. Speak right up. With the court's permission, I'd like to reserve two minutes of my time for rebuttal. Eight police officers entered Mr. Callahan's video store in combat gear and with guns drawn to secure the location pending the issuance of a search warrant. The government argues that this didn't violate the Fourth Amendment simply because Mr. Callahan's store was open to the public at the time. But what this argument ignores is that there's a significant difference between entering a store and seizing it. Pottery Barn, for example, is also a store that's open to the public and therefore a police officer could go in, look around without having probable cause or even reasonable suspicion. But if that same police officer went inside Pottery Barn, drew his gun, forced people to the floor and handcuffed them and wouldn't let them leave, then that constitutes a seizure and you better have probable cause. This is true even if the seizure is for the purpose of securing the location pending the issuance of a search warrant. As the Supreme Court recognized in Segura and in Place and as this court recognized in Lakata, the police may secure a location or a container pending the issuance of a search warrant but only if there's probable cause. And the reason for this rule is clear. This rule makes sense. The police need probable cause in order to obtain a search warrant. It therefore follows that if they want to go into a location and secure it while they get that search warrant, they have to have probable cause. Or to put it another way, if the police don't have probable cause when they go in to secure the location, they don't have probable cause for the warrant and they don't have a basis for securing the location in the first place. So probable cause is the appropriate standard. And here the police did not have probable cause. What they had was they had Chance Shorty, Mr. Callahan's vindictive ex-girlfriend with a criminal history a mile long and a 10-year history of harassing Mr. Callahan and his girlfriend, later his wife, all of which was well documented with the Long Beach Police Department. Hadn't she provided other information to the officers and had been a reliable informant? There's one bald allegation made by the officers saying that. And it's actually not even based on the personal knowledge of the officers who submitted declarations and testimony in the district court. Officers or, excuse me, detectives Burns and Smart, they were told by another officer, Detective Hector Neves, that, oh, she's reliable. And the government wants to have it both ways. They want to say, well, the officers could rely on the fact that Neves said she was reliable, but they can claim ignorance of the facts that must have been known to Neves, which was her extensive criminal history and her, in particular, her. A lot of people with extensive criminal histories give information. That's very true, Your Honor. And that's why I think the more significant fact is her criminal history as it pertains to her harassment of Mr. Callahan and his wife for ten years. At the time the search warrant, at the time the police officers went in to raid the store, she had not only been convicted of battery against Mr. Callahan and had a restraining order that prevented her from going near Mr. Callahan. She, in that case, had failed to show up for a court appearance. There was an outstanding warrant for her arrest in that very case. So the fact that the police detectives claim ignorance of all these facts, oh, well, we had no idea that this was going on. We just thought she was a reliable informant. I don't think they can do that because they're in a catch-22 situation. If they want to rely on the fact that, oh, she's provided reliable information in the past, then I think they bring all the baggage with them, and they have to know about this relationship with Mr. Callahan, which makes it highly unlikely to believe her story, which is that Mr. Callahan said, Come on into my video store. I want to show you my pile of cocaine and tell you about the drug deal I'm going to do later today. They go by the place, and there's the, what, white Cadillac or white something or other out in front of the car. As she said, there would be a car out front, the defendant's car. Your Honor, that's true, but I don't know why it's unusual to find my client's car outside his store. I don't know where else it would be. Right. And she said there'd be people as lookouts around, and apparently there were some people that could have been lookouts. I'm not so sure about that, Your Honor. Mr. or Detective Smart says there is, but there's significant points to be made about those lookouts. The first is that the search warrant affidavit that was prepared within an hour or so after the raid by Miss Detective Smart did not mention that one of the things that Chance Shorty said would be there would be lookouts, and it did not mention that he saw lookouts, which is very suspicious if you figure that he's trying to establish probable cause, and of everything that the government points to now, the presence of lookouts out front would probably be the most significant fact they can point to. So that's a significant fact. The other significant fact is that he didn't provide details, and he does the same thing with the high-end cars. He said there were high-end cars around or lookouts around. He never says how many. He never says exactly what they were doing that made him think there were lookouts. And then the third thing with regard to the lookouts that I think undercuts any effect it would have or any weight it would have on the probable cause issue is Detective Smart says he went to the location. He was sitting out front watching. This is when he saw the supposed lookouts. He did not leave that location or stop his surveillance from the time he got there until the time the raid occurred. There's never any mention of what happened to those supposed lookouts. He never said when the police came in, they tried to warn the people inside. He never said they ran away. He never said they ran inside, and those were the people who were inside. If there were lookouts, where would they have gone? He never explained that. And so given the fact that – Maybe they were just really cool customers. Excuse me? Maybe they were just really cool customers, to use a street phrase. They could be, Your Honor. And, I mean, the same problem with the lookouts, as I mentioned, is also an issue with the other thing the police officer pointed to, which is the presence of high-end cars. To this day, and maybe Mr. Umhoffer can explain, I don't understand why the presence of high-end cars is a significant fact, unless they're trying to imply that because the people inside were African-American and therefore high-end cars means, oh, they must be drug dealers, which is a clearly impermissible inference. I don't understand what the presence of high-end cars, how that leads to the conclusion there's a drug deal going on. And I think everything that they point to is an insignificant fact like that. So if we go back to Chance Shorty and realize that however you look at whether she was reliable or whether she should be looked at just like an anonymous source because of the baggage that comes with her, her tip has value only to the extent that the police could corroborate significant details. And I emphasize the word significant because none of the details the government relies on and the police relies on were significant. And therefore, Your Honor, I think that there was no probable cause for the seizure, which is clearly the standard for under the Fourth Amendment for this type of activity. And therefore, Mr. Callahan's motion to suppress should have been granted. Thank you. You were almost right at two minutes. You got it for rebuttal. We'll hear from the government at this time. Mr. Umhoffer. Good morning, May it please the Court. Matthew Umhoffer on behalf of the United States. Neither you or I will hold against your opponent his reference to bald allegations. It was appropriate to the extent that it described the state of my follicles, Your Honor. The district court in this case, Judge Minella correctly admitted the defendant's three guns, which were found during the course of a search warrant. Judge Minella correctly decided that that search warrant was based properly on evidence obtained after the evidence, store and seized it and seized the defendant. Now, the defendant's arguments take two forms. The first is that the officers were not properly in the store. Now, I think there's two ways to analyze what happened in the store. Of course, the government's not arguing that it needed no evidence in order to seize the store. As set forth in the papers, and I believe this was just a misunderstanding of the government's argument, the officers obviously did not need any facts in order to go into the store, initially enter the store. But additional facts were required. Now, there's two ways to analyze this. The first is under Terry. How many went in the store? I'm sorry? How many went in the store? Eight officers. Eight officers went in the store. Eight armed officers. Correct. And they seized the store with guns drawn in, as Judge Minella correctly. Were they in there looking around? Of course not. Of course not. And, of course, so I think that was a misunderstanding of the government's argument. The government's not saying that officers can go into a store with guns drawn without any facts. But here's the two ways. So you really have to have probable cause. Well, actually, Your Honor, I'd like to present two different ways of thinking about this. First, thinking of the entry into the store and the seizing of the store as a Terry stop. In essence, the officers seized and frisked the store. And for that, you only need probable cause. Now, Terry has not been limited to persons. It's also been extended to cars and traffic stops and also to locations. The First Circuit recently did this both in Beaudoin and Romaine. The First Circuit, within the last year, has noted that Terry does extend to locations. And so in that case, you only need probable cause. The other way to look at it. Why the sort of storm trooper approach? Your Honor, the district court made an observation about this, and I think she was correct. Where we have an allegation from what the officers believed at the time they entered. And this was another. And we'll get to that in a moment, I'm sure. But at the time they entered, they believed that this informant was reliable. There's no evidence that these officers who entered knew anything about the storming relationship between the informant and the defendant. The focus under U.S. v. Ilamalo, which is the case that says, which is the second way to think about this, which is, of course, the officers went in and, excuse me, froze the location in anticipation of getting a search warrant. In that case, U.S. v. Ilamalo, this court said that the focus is what is known to the officers. Not what should have been known. Not what might have been known in a perfect world. But what was known. And what they knew was that there was a reliable informant saying that there, in that store, was the defendant who has a criminal history, a drug trafficking conviction. That was known to the officers. His brother was also recently arrested in a drug trafficking incident. And eight kilograms of cocaine. That's the tip. And they've confirmed this by sitting out in front and seeing the lookouts. And, by the way, I think there was a misstatement or a misunderstanding of the facts. I think that at some point you're going to get around to answering my question. I am. I am, Your Honor. How much longer do I have to wait? I'll get right to it. As Judge Minella said, and I think she was correct here, it would be a naive group of officers who would go into a place where there was a lot of drugs without assuming, correctly so, that guns would be present. This court has, and many other courts, have regularly noted the troubling nexus between drugs and guns. If officers are going to go in, they're not going to go into a drug trafficking situation. The reasonable inference is that there's guns there. And, in fact, there were three guns. And so it was reasonable for the officers to go in the way they did, and Judge Minella, I think, correctly found that. Now, in addition to the facts. Explain to me the tactics. I can understand sending in five, six, eight, whatever officers, but what's wrong with uniformed officers who are armed? Why do you have to go in like you're raiding a dissident's home in Baghdad? Well, in this case, Your Honor, they had not just evidence that there was drugs in the place, but there were lookouts out front. And I think this is important, and it wasn't just a bald allegation. I think this was a misstatement of the facts. It wasn't just a bald allegation that there were lookouts. Detective Smart specifically states at page 162 in the record that these individuals were alert and scanning the area. They were standing out front, alert and scanning the area. Now, what this shows, Your Honor, is that they've got muscle, and they're keeping an eye out for cops coming in. They're ready. And the reasonable inference to be drawn is if police were to enter, they're prepared. If somebody, and not just police, but possibly other people seeking to rip the drug deal. And so the reasonable inference is they got lookouts. They're ready for anything. They're ready for people who might come in armed to take the drugs. And so I think it's a reasonable inference for these officers to draw that the safest course was to go in to a situation. Did anyone stay and watch the lookouts? And they did. That would be the big risk if they're what you say. They did. And while assembling the team, Detective Smart stayed out front and watched. And he also watched, and this is in the affidavit as well, as numerous cars came and left. And he also identified the high-end cars, a stolen car parked right out front that was identified as stolen, another troubling fact. And so they had all these facts that the lookouts that were supposedly out front. There's no, there's nothing in the record as to what happened to those lookouts at the time they entered. And I think the reasonable inference to be drawn is the one that Judge Hawkins drew, which is that these individuals were cool customers. It also, and another reasonable inference. You mean what, they just wandered off when they saw trouble happening? Yes. Yes. I think that's the reasonable inference to be drawn. The other reasonable inference to be drawn, by the way, is that at the time Detective Smart arrived, the drugs were in the place. The lookouts were out. By the time the officers got their team together and went in, and I believe there's about a three-hour delay there as the officers assembled their team and went in, the drugs were gone and the lookouts were gone. Could you say that again? I lost you on that one. The reasonable inference to be drawn here is that at the time Detective Smart arrived, the lookouts were outside and the drugs were inside. By the time they were able to assemble a team and go in, the drugs were gone and the lookouts were gone because no drugs were found, but evident white powder residue on plates and. . . A small amount like personal use. Actually, no. There was a small amount of marijuana and there was a small inside the place and there was a small amount of crack cocaine in the stolen Escalade out front. However, there was a plate covered with residue. And the reasonable inference to be drawn there is that they were cutting the drugs because the informant tip was eight kilograms in the place, two were going to be sold immediately. And so that's the facts before us that they cut. And a reasonable inference to be drawn is that that plate was a plate that was used for cutting the drugs into a smaller amount. And so what you've got, you've got a reliable informant. Now let's talk about that for a moment. Detective Nieves, a very experienced officer, according to both affidavits, told the officers that this was an extremely reliable informant. She provided reliable information in the past. Now at that moment, those officers are dealing and Detective Smart says, in fact, Nieves had given me informant tips before, they'd all panned out. And he's telling me that this woman had given him tips before and they'd all panned out. Under those circumstances, the officers had no reason to doubt Ms. Shorty's reliability, Ms. Simpson's reliability. And at that point, so and again, the focus is on what the officers knew when they went in. I don't think there's any reason to impute to officers executing a search warrant or freezing a place the contents of the entire criminal history database. There's just nothing there. What is there is U.S. v. Alamalo in saying it's what's known to the officers that matters. And what's known... Nieves had worked with the informant before? Nieves had worked with the informant before. For how long? That's not in the record. It just says that she'd provided numerous tips to him. So on more than one occasion. That had panned out, yes. So he'd developed a relationship with her where she provided information and he had acted on that information and he had found it to be reliable. That's correct. Yet he knew nothing about her relationship to this defendant. There's no evidence in the record of that effect. And if the defendant had wanted to develop those facts, he could have. He could have called Detective Nieves. He didn't. There's absolutely no evidence that Detective Nieves knew of her storming relationship with the defendant. And by the way, this court in Bishop and Striffler, in both those cases, noted that it would be a naive magistrate to think that somebody would come in off the street with altruistic reasons and provide information. Somebody's always got an axe to grind when they're informing on somebody. And so the fact that she had an axe to grind with the defendant, and I'm not sugarcoating her history, it's not great. And if the officers had known that, maybe this would have been different. This is Long Beach? Yes. Long Beach. Yes. She made him look pretty foolish, didn't she? She did. She did to the extent that drugs were not found. But there was a lot of smoke when they went in. Three guns, cocaine powder, stolen car, a person with a warrant, with a wanted warrant in the place. And the defendant's admission that he's a convicted felon and has three guns, that he just has because I knew I wasn't supposed to have them. Could you elaborate on how the Terry principle works for securing a location? Of course, the Terry principle initially was a brief stop investigation and patting somebody down. How does it work with the location? Well, I think you've got to look at what the First Circuit did most recently in United States v. Romaine, where they, relying on their previous decision in U.S. v. Boudouin, said, look, Terry was intended to apply to officers who, in reasonable concern for their safety and with reasonable suspicion that criminal trafficking was underway, to secure in Terry an individual, in this case a location, and make sure it's safe for the officers to continue their investigation and do some questioning. The First Circuit said there's absolutely no basis for limiting Terry to a person because officers encounter locations just as often as they encounter people. And Terry was intended to protect officers and give them an opportunity to secure a location, make sure it's safe for them to continue their brief location. Following that analogy, once the person has been patted down and so forth and examined, you have to have probable cause to further hold the person, to seize the person. In this situation, how did this then graduate to probable cause? Well, actually, I don't think you do, Your Honor, because all that needs to happen, the defendant is arguing fruit of the poisonous tree. And what the defendant wants is to keep out of the warrant the statements the defendant made when he went in. One minute into the officer's entry, the officers asked the defendant, do you have any guns? And he said, yes. That made its way into the warrant, and that is what provided probable cause to search the place, according to the district court. So our – while you may be right that the search was for guns, right? The search was for guns and drugs. And the judge – Now, there was no probable cause for drugs. Actually, there was. Right. Well, Judge Minnell held that there was not. The government's position is that there was, but has exceeded to that point. What would be the probable cause for drugs? The probable cause for drugs was this, the tip from the reliable confidential informant at the time. Oh, going back to that. Not just the – The defendant's drug convictions. Right. Okay. But at the moment where the defendant was asked those questions, it made its way – it was just a Terry stop. Now, there is a question about what happens after that moment, but at that moment, it was just a Terry stop. In either way, whether it's reasonable suspicion the court requires for a probable cause, the government believes that the facts establish both of those and that the search warrant was therefore valid. Thank you. Thank you. Counsel? Thank you, Your Honor. With regard to the government's argument that this can be classified as akin to a Terry stop, I'd point the court to the reply brief at pages four and five, and particularly this court's decision in United States v. Licata, where basically the court rejected the government's argument with regard to a container. And there it said the agency did not seize Licata's package for the purpose of investigation. Their purpose was to hold the package until they obtained either its consent to open it or a search warrant. And that's a cease and desist for the probable cause. So I think that the issue here is clearly was there a probable cause. And with regard to that, I just wanted to mention a couple of things that the government mentioned in its argument. First of all, the fact that cars were coming and going, again, it's a video store. How is that significant, cars are coming and going? That's what happens at a video store. The second thing, the government mentioned the stolen car, but it keeps ignoring, and yet it acknowledges that the issue is what did the police officers know when they initially entered the store? And it's undisputed if the court looks at pages 210 and 211 in the record that Officer Smart admitted they didn't know the car out front was stolen until after the seizure, so that's not an issue. And finally, I just want to point out that even now the government's not admitting that they were led down the garden path by Champ Shorty. There was nothing found inside that indicated that there was a drug deal going on. The only evidence of drug use found in there was evidence of personal use of drugs. And if there had been a drug deal going on, Detective Smart would have to be the most incompetent police officer to have that go on under his nose and not even notice it happening. And as I said, he was there the whole time. So Champ Shorty did provide them with a bogus tip, and they should have known that because it was nothing to corroborate her story, certainly nothing to establish probable cause. Thank you, Your Honor. Thank you for your argument. Thank both counsel for their arguments. We'll proceed to the next case on the calendar, which is Corbin v. Lockheed Martin. If counsel are present, please come forward, please.
judges: Hug, Thompson, Hawkins